IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INARI MEDICAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 24-1023-CFC |
| | ) | |
| v. | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| INQUIS MEDICAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF INARI MEDICAL, INC'S ANSWERING BRIEF IN OPPOSITION TO INQUIS MEDICAL, INC.'S MOTION TO DISMISS

OF COUNSEL:

John C. Hueston
Christina Rayburn
HUESTON HENNIGAN LLP
620 Newport Center Drive
Suite 1300
Newport Beach, CA 92660
(949) 229-8640

Karen Younkins
HUESTON HENNIGAN LLP
523 W. 6th Street, Suite 400
Los Angeles, CA 90014
(213) 788-4340

Kelly E. Farnan (#4395)
Sara M. Metzler (#6509)
Edmond S. Kim (#6835)
Richards, Layton & Finger, PA
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
farnan@rlf.com
metzler@rlf.com
ekim@rlf.com

*Attorneys for Plaintiff Inari Medical, Inc.*

Dated: November 18, 2024

# **TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ..................................................................... ii

I.     NATURE AND STAGE OF PROCEEDINGS............................................ 1

II.    SUMMARY OF ARGUMENT ............................................................. 1

III.   STATEMENT OF FACTS ................................................................... 3

     A.   Inquis Retains Inari's VP .................................................... 3

     B.   Inquis Secures FDA Clearance and Sells Infringing
          Products ........................................................................... 3

     C.   Inari Discovers the Misappropriation and Inquis Stops
          Engaging .......................................................................... 4

IV.    ARGUMENT ................................................................................... 4

     A.   Inari's Trade Secret Claims are Sufficiently Pled ................... 5

          1.   Inari Adequately Identified its Trade Secrets .............. 5

          2.   Inari Sufficiently Alleged Inquis' Misappropriation ..... 9

     B.   CUTSA Does Not Preempt Inari's Intentional
          Interference Claim ........................................................... 12

     C.   Inari's Patent Claims are Sufficiently Pled ......................... 14

          1.   Inquis' Safe Harbor Defense Fails ............................ 14

          2.   The Complaint Sufficiently Alleges Patent
               Infringement ........................................................ 17

          3.   The Complaint Properly Relies on Inquis' Patent
               Materials .............................................................. 20

          4.   Inari Sufficiently Pled Indirect and Willful
               Infringement ........................................................ 21

V.     CONCLUSION ............................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Boston Scientific Corp. v. Nevro Corp.*,
415 F.Supp.3d 482 (D. Del. 2019) .......................................................6, 7

*Illumina, Inc. v. Guardant Health, Inc.*,
2023 WL 1407716 (D. Del. Jan. 31, 2023) ...........................................8

*Amgen v. Hospira*,
336 F.Supp.3d 333 (D. Del. 2018) .......................................................15

*Amron Int'l Diving Supply v. Hydrolinx Diving*,
2011 WL 5025178 (S.D. Cal. Oct. 21, 2011).......................................13

*Arthur J. Gallagher v. Tarantino*,
498 F.Supp.3d 1155 (N.D. Cal. 2020)..................................................13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..............................................................................4

*Baxter Healthcare v. HQ Specialty Pharma*,
157 F.Supp.3d 407 (D.N.J. 2016).........................................................10

*Bayer v. Roche Molecular Sys.*,
72 F.Supp.2d 1111 (N.D. Cal. 1999)....................................................12

*Becton, Dickinson v. Cytek Biosciences*,
2018 WL 2298500 (N.D. Cal. May 21, 2018) .....................................13

*Bot M8 v. Sony Corp. of Am.*,
4 F.4th 1342 (Fed. Cir. 2021) ..............................................................17

*Chang v. Biosuccess Biotech*,
76 F.Supp.3d 1022 (C.D. Cal. 2014)....................................................15

*Classen Immunotherapies v. Somaxon Pharms.*,
2013 WL 9947386 (C.D. Cal. Apr. 11, 2013).......................................17

## TABLE OF AUTHORITIES (cont.)

**Page**

*Deere & Co. v. AGCO*,
   2019 WL 668492 (D. Del. Feb. 19, 2019) ...........................................................21

*Deloitte Consulting v. Sagitec, Sols.*,
   2023 WL 6039069 (D. Del. Sept. 15, 2023) .........................................................7

*Disc Disease Sols. v. VGH, Sols.*,
   888 F.3d 1256 (Fed. Cir. 2018) .................................................................. 18, 19

*DSM IP Assets v. Honeywell Int'l*,
   700 F.Supp.3d 189 (D. Del. 2023) ............................................................ *passim*

*Extreme Reach v. Spotgenie Partners*,
   2013 WL 12081182 (C.D. Cal. Nov. 22, 2013) ..................................................11

*Horatio Washington Depot Techs. v. TOLMAR*,
   2018 WL 5669168 (D. Del. Nov. 1, 2018).........................................................16

*Immunomedics v. Roger Williams Med. Ctr.*,
   2017 WL 58580 (D.N.J. Jan. 4, 2017) ...............................................................14

*K.C. Multimedia v. Bank of Am. Tech. & Operations*,
   171 Cal. App. 4th 939 (2009)...........................................................................12

*Leucadia v. Applied Extrusion Techs.*,
   755 F.Supp. 635 (D. Del. 1991) ..........................................................................5

*McDermott v. Clondalkin Grp.*,
   649 F.App'x 263 (3d Cir. 2016)................................................................. 12, 20

*McZeal v. Sprint Nextel*,
   501 F.3d 1354 (Fed. Cir. 2007) ................................................................. 17, 19

*Momenta Pharms. v. Teva Pharms.*,
   809 F.3d 610 (Fed. Cir. 2015) ...........................................................................15

*Nalco v. Chem-Mod*,
   883 F.3d 1337 (Fed. Cir. 2018) .........................................................................18

# TABLE OF AUTHORITIES (cont.)

**Page**

*Oakwood Lab'ys. v. Thanoo,*
  999 F.3d 892 (3d Cir. 2021) ....................................................................5, 7

*Peloton Interactive v. iFIT,*
  2022 WL 1523112 (D. Del. May 13, 2022) ........................................11

*Progressive Sterilization v. Turbett Surgical,*
  2020 WL 1849709 (D. Del. Apr. 13, 2020) .......................................7, 8

*REGENXBIO v. Sarepta Therapeutics,*
  2022 WL 609141 (D. Del. Jan. 4, 2022) ....................................... 14, 16

*Sylabs v. Rose,*
  2023 WL 8813517 (N.D. Cal. Dec. 19, 2023) ....................................14

*TexasLDPC v. Broadcom,*
  2021 WL 1092578 (D. Del. Mar. 22, 2021) ........................................21

*Uniloc 2017 v. Zenpayroll,*
  2021 WL 271800 (D. Del. Jan. 27, 2021) ...........................................19

*Ventrassist Pty v. Heartware,*
  377 F.Supp.2d 1278 (S.D. Fla. 2005) .................................................16

*ZapFraud v. Barracuda Networks,*
  528 F.Supp.3d 247 (D. Del. 2021) .....................................................22

Statutes

18 U.S.C. §1839(5) ...............................................................................10

35 U.S.C. §271(e)(1) ....................................................................... 15, 16

Cal. Civ. Code. §3426.1 ........................................................................10

Regulations

21 C.F.R. §807.95(e)................................................................................9

## I.    NATURE AND STAGE OF PROCEEDINGS

Inari Medical, Inc. ("Inari"), a pioneering healthcare company that aims to change the standard of care for certain blood clot conditions such as venous thromboembolism ("VTE"), brought this action against Inquis Medical, Inc. ("Inquis") for misappropriation of trade secrets, patent infringement, and intentional interference with contractual relations.  D.I. 1 ("Complaint" or "Compl.").  Inquis moved to dismiss.  D.I. 12 ("Motion" or "Mot.").

## II.    SUMMARY OF ARGUMENT

1.    Inquis sells products that are directly competitive with Inari's products, infringe Inari's patents, and benefit from misappropriation of Inari's trade secrets. Inquis' scheme to misuse Inari's intellectual property involved hiring one of Inari's executives as a "consultant" while he was still employed at Inari.  Within days of Inquis retaining him, this conflicted executive downloaded *Inari's* trade secrets, copied them to a thumb drive folder titled "Inquis Medical," and later used them to, among other things, secure unusually fast FDA clearances for Inquis' competing and infringing products.

2.    While Inquis challenges every claim in the Complaint, its challenges are meritless.

3.    *First*, Inquis asserts that the Complaint fails to adequately identify the trade secrets or explain how Inquis misappropriated them.  Not so.  The Complaint

- 1 -

identifies specific documents that Inquis accessed and explains which trade secrets are contained in those documents. Compl. ¶¶50-54. Numerous courts, including this Court and the Third Circuit, have allowed indistinguishable allegations at this stage. The Complaint also explains why Inquis is both directly and vicariously liable for the misappropriation. Compl. ¶¶3, 44-45, 49-50, 57, 78.

4.  *Second*, Inquis argues that Inari's tortious interference claim is preempted by CUTSA because it is based on allegations regarding trade secret misappropriation. But this claim is not predicated on Inari's trade secret allegations. Instead, it is directed to Inquis' intentional hiring of an ongoing Inari employee to concurrently work on competing products for both Inquis and Inari. Such allegations are not preempted.

5.  *Third*, Inquis makes three unsuccessful arguments as to Inari's patent infringement claims. Inquis is incorrect that the "safe harbor" protects it here: "safe harbor" is an affirmative defense inappropriate for consideration at this stage. Inquis is also incorrect that Inari's claims are insufficiently pled: Inari's "information and belief" pleading and use of Inquis' patents as infringement evidence is sufficient under controlling law. Finally, Inquis is incorrect that Inari's pleading of notice for its indirect and willful infringement claims is deficient. While understanding this Court's view, developing case law in this District has resulted in the weight of authority finding that the filing of a Complaint is sufficient notice.

## III.    STATEMENT OF FACTS

### A.    Inquis Retains Inari's VP.

After years of sustained investment, Inari successfully developed, proved the efficacy of, and received FDA clearance for several award-winning medical devices to treat VTE.  Compl. ¶2.  The USPTO has awarded Inari over 50 patents.  *Id.*

Inquis, a start-up, retained Inari's VP of Regulatory Affairs & Quality Assurance, Kit Cariquitan, to help secure FDA clearance for Inquis' competing products *while Cariquitan was employed by Inari.*  *Id.* ¶3.  Soon thereafter, Cariquitan downloaded several of Inari's most confidential documents containing *Inari's* trade secrets and copied them to a thumb drive folder titled "***Inquis Medical.***" *Id.* ¶3.  The Complaint specifically identifies documents that Cariquitan took and describes the trade secrets contained therein.  *Id.* ¶¶50-54.

### B.    Inquis Secures FDA Clearance and Sells Infringing Products.

Following this theft of Inari's trade secrets, Cariquitan and Inquis used those trade secrets to secure unusually fast FDA clearance for Inquis' Aventus Thrombectomy and Aventus Clot Management systems ("Accused Products").[1]  *Id.* ¶¶60, 93; *see also id.* ¶22.  Inari believes that Inquis now sells those products directly

---

[1] Inari had the only FDA-cleared blood return device until clearance of Inquis' Clot Management System.

to physicians and hospital providers.  *Id.* ¶96.  Inari has been unable to obtain a sample.  *Id.*

### C.    Inari Discovers the Misappropriation and Inquis Stops Engaging.

Inari terminated Cariquitan the day it learned that Cariquitan was working as an Inquis consultant.  Compl. ¶65.

Inquis initially appeared willing to help Inari investigate Cariquitan's wrongdoing.  Inari, Inquis, and Cariquitan signed a Forensic Protocol under which Cariquitan's personal laptop, drives, and email were analyzed.  *Id.* ¶69.  After reviewing that information, Inari requested that Inquis provide its communications with Cariquitan and its final relevant FDA submissions, so Inari's counsel could assess what information Cariquitan transmitted to Inquis and what Inari information Inquis used.  *Id.* ¶72.  Inquis refused.  *Id.*

## IV.   ARGUMENT

Although "a [complaint] must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief[,]'…'detailed factual allegations'" are not required.  *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  To survive a motion to dismiss, a complaint should include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.*

**A.    Inari's Trade Secret Claims are Sufficiently Pled.**

    1.  <u>Inari Adequately Identified its Trade Secrets.</u>

Inquis argues that the Complaint does not adequately identify the misappropriated trade secrets.  At the pleading stage, trade secrets "must be identified with enough specificity to place a defendant on notice of the bases for the claim being made against it."  *Oakwood Lab'ys. v. Thanoo*, 999 F.3d 892, 906 (3d Cir. 2021).  A plaintiff need not "spell out the details of the trade secret to avoid dismissal," and must only describe the trade secret "with sufficient particularity to separate it from matters of general knowledge."  *Id*. (cleaned up).  Courts "are in general agreement that trade secrets need not be disclosed … in a complaint … [because] such a requirement would result in public disclosure of the purported trade secrets." *Leucadia v. Applied Extrusion Techs.*, 755 F.Supp. 635, 636 (D. Del. 1991) (citation omitted).

Here, Inari adequately separated its trade secrets from matters of general knowledge and provided Inquis with "notice of the bases" for Inari's claims. *Oakwood*, 999 F.3d at 906.  Specifically, the Complaint identifies Inari's "highly confidential [] files" that Cariquitan downloaded for use at Inquis.  Compl. ¶¶49-51, 61-62.  The Complaint then lists the categories of trade secrets contained in those files, including "product designs, assembly instructions, testing protocols, and the

very path that Inari followed to successfully gain FDA 510(k) clearance for [its products]." *Id.* ¶¶51, 62.

While these allegations alone are sufficient to identify the trade secrets under the authorities discussed below, the Complaint provides further detail. For example, the Complaint alleges that "the test protocols and test results Cariquitan downloaded contained highly confidential information regarding what tests Inari ran to respond to deficiencies and secure 510(k) clearance, what the protocols were for those tests (e.g., what variables were used in testing) and the results of those tests." *Id.* ¶52. As another example, the Complaint explains that "Inari's confidential communications with the FDA" would "essentially provide a roadmap of what the FDA requires for 510(k) clearance, and how to meet those requirements," including information about "what information, evidence, or revised testing the FDA deems sufficient to respond to those issues." *Id.* ¶53.

These allegations are sufficient to provide notice of Inari's claim, and courts have accepted less detailed allegations at this stage. For example, in *Boston Scientific*, this Court considered allegations asserting that the defendant had misappropriated "[the plaintiff's] protocol to run the clinical investigation for its [] product" and "study design, methodology/testing requirements, and monitoring requirements." 415 F.Supp.3d 482, 496-97 (D. Del. 2019). This Court held that

"[t]his level of detail … provides sufficient particularity to survive a motion to dismiss." *Id.*

Other courts, including the Third Circuit, have reached the same conclusion as to analogous allegations. *See Oakwood*, 999 F.3d at 907 (trade secrets consisting of "information laying out [the plaintiff's] design, research and development, test methods and results, manufacturing processes, [and similar information]" were "plainly sufficient"); *Deloitte Consulting v. Sagitec Sols.*, 2023 WL 6039069, at *2 (D. Del. Sept. 15, 2023) (trade secrets consisting of certain "categories of information," including applications, design, and frameworks, were sufficient); *Progressive Sterilization v. Turbett Surgical*, 2020 WL 1849709, at *6 (D. Del. Apr. 13, 2020) (similar allegations sufficient).

In arguing that Inari's allegations are inadequate to put it on notice of the trade secrets at issue, Inquis mischaracterizes—or outright ignores—Inari's allegations. It incorrectly asserts that the Complaint "define[s] Inari's 'trade secrets'" only as "either a portion or the entirety of the files Cariquitan allegedly downloaded." Mot. 9. But as outlined above, the Complaint specifically alleges what information in the downloaded files constitutes Inari's trade secrets. *See* Compl. ¶¶51-62. These are precisely the types of allegations courts (including this Court) have deemed sufficient.

- 7 -

The very authorities Inquis relies on demonstrate why Inari's allegations are adequate. For example, in *Illumina v. Guardant Health*, the plaintiffs identified two sets of trade secrets: slides that contained "proprietary and confidential concepts for improving error rates … in genetic sequencing" and "51,000 documents … which contained 'trade secret information.'" 2023 WL 1407716, at *8 (D. Del. Jan. 31, 2023). The court found the first set to be adequately pled, but not the latter. *Id*. at *9. Here, contrary to Inquis' mischaracterization, Inari's allegations are not simple references to tens of thousands of documents, but rather identifications of specific categories of information within specific files, which the *Illumina* court found adequate.

Separately, Inquis also argues: "[t]o the extent Inari contends its trade secrets include its 510(k) regulatory materials," those trade secrets "are public." Mot. 10. To begin, Inari's trade secrets are not limited to its 510(k) regulatory materials. Compl. ¶¶51-62. Regardless, those materials are *not* public. As the Complaint explains, "[a]lthough the FDA will make a 510(k) summary of the safety and effectiveness data available to the public within 30 days of clearance, the full premarket 510(k) submission … is typically not made public due to the trade secret, confidential commercial, and/or personal nature of such information." *Id.* ¶¶16, 51. Courts have acknowledged this well-known industry fact. *See Progressive Sterilization*, 2020 WL 1849709, at *6 (recognizing that substantial portions of

510(k) materials are "[n]on-public submissions" and finding these were sufficiently particularized trade secrets); *see also* 21 C.F.R. §807.95(e) (acknowledging that information may be "exempt from public disclosure in accordance with part 20 of this chapter [Chapter I]").

2.   Inari Sufficiently Alleged Inquis' Misappropriation.

Next, Inquis argues that the Complaint "does not sufficiently allege facts that ***Inquis***"—as opposed to its agent and consultant, Cariquitan—"obtained or used Inari's purported trade secrets."   Mot. 12.   Once again, Inquis ignores and mischaracterizes Inari's allegations.

As the Complaint explains, Inquis retained Cariquitan to "help Inquis secure FDA clearance for [its] products that are directly competitive with Inari's [products]."  Compl. ¶43.   When it retained Cariquitan, "Inquis knew Cariquitan [was employed by] Inari," and "[o]n information and belief, [] was hoping to use [Inari's] trade secrets … to enable and shorten Inquis' path to clearance."  *Id.* ¶¶44, 45.  Two days after Inquis retained him, Cariquitan downloaded Inari's trade secrets and put them in a folder titled "Inquis Medical" (thus indicating that they were intended to be used for Inquis' benefit).  *Id.* ¶¶3, 49-50, 57, 78.  On information and belief, Cariquitan then used Inari's trade secrets to secure FDA clearance for the Accused Products with unusual speed.  *Id.* ¶¶55-58, 63-64, 77.  These allegations

are sufficient to plead both direct and vicarious theories of misappropriation against Inquis.

*First*, Inari adequately alleges direct liability because it alleges that Inquis either knew of and authorized Cariquitan's improper acquisition and use of Inari's trade secrets or was willfully blind to such acquisition and use. *Id.* ¶¶44-47. Under both DTSA and CUTSA, an entity that acquires, discloses, or uses someone else's trade secret (here, Inquis) while "know[ing] or ha[ving] reason to know" that the trade secret was improperly acquired by another (here, Cariquitan) is directly liable for misappropriation. *See* 18 U.S.C. §1839(5); Cal. Civ. Code. §3426.1. As a matter of law, willful blindness to the improper acquisition or use of a trade secret cannot preclude liability. *See, e.g.*, *Baxter Healthcare v. HQ Specialty Pharma*, 157 F.Supp.3d 407, 426 (D.N.J. 2016) ("If HQ was willfully blind to the circumstances indicating Mr. Owoo's improper use of Baxter's trade secrets, HQ may be liable for misappropriation.").

*Second*, Inari's allegations adequately plead vicarious liability against Inquis. The Complaint explains that Cariquitan acted as Inquis' agent and consultant while acquiring and using Inari's trade secrets for Inquis' benefit. *Id.* ¶¶3, 44-45, 49-50, 57, 78. Inquis does not (and cannot) dispute the adequacy of these agency allegations. Because, under both federal and California law, a principal is vicariously liable for the misappropriation of its agents, Inari's allegations

- 10 -

adequately allege vicarious liability.  *See Peloton Interactive v. iFIT*, 2022 WL 1523112, at *2 n.1 (D. Del. May 13, 2022) ("[M]any federal district courts have held that the DTSA allows for respondeat superior liability" (citing cases)); *Extreme Reach v. Spotgenie Partners*, 2013 WL 12081182, *7 (C.D. Cal. Nov. 22, 2013) (a principal can be vicariously liable under CUTSA).

Inquis' Motion ignores Inari's allegations, mischaracterizing them as being limited to only three facts: (1) that Cariquitan was in "possession of Inari's trade secrets," (2) that "he performed consulting work for Inquis," and (3) that the FDA cleared Inquis' submission with "relative speed."  Mot. 12-13.  But as outlined above, what Inari's allegations actually establish is that: (i) Cariquitan downloaded Inari's trade secrets mere *days* after being retained by Inquis and for the express purpose of using them at Inquis (as is evidenced by his downloading of the trade secrets into a folder titled "Inquis Medical"); (ii) Cariquitan then actually used those trade secrets for Inquis' benefit (as evidenced by both the circumstances surrounding his downloading of Inari's trade secrets and Inquis securing unusually fast FDA clearance); and (iii) Inquis either knew and expressly authorized this trade secret use or was willfully blind to it (and even if it was not, Inquis is still vicariously liable for Cariquitan's actions).  Compl. ¶¶3, 44-45, 49-50, 57, 65, 78.  These allegations plead plausible misappropriation at this stage, and Inquis does not cite any case in which similar allegations were held to be inadequate.

To the extent Inquis takes issue with certain of Inari's allegations being made on "information and belief," such concerns are unfounded. Allegations made on information and belief are permissible "[w]here it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control"—so long as "[p]laintiffs ... accompany their legal theory with factual allegations that make their theoretically viable claim plausible." *McDermott v. Clondalkin Grp.*, 649 F.App'x 263, 267-68 (3d Cir. 2016). Here, the intricacies of Cariquitan's and Inquis' use of Inari's trade secrets are within their exclusive knowledge, and it is therefore necessary for some allegations concerning Inquis' misappropriation to be made on information and belief. Because those allegations are plausible in light of all the specific facts alleged in the Complaint, as outlined above, they are proper.[2]

## B.    CUTSA Does Not Preempt Inari's Intentional Interference Claim.

Inquis argues that Inari's intentional interference claim is preempted under CUTSA. Mot. 14-16. CUTSA preemption precludes only those claims that are "based on the same nucleus of facts" as a trade secrets claim. *K.C. Multimedia v.*

---

[2] Inquis also asserts that, "to the extent Inari alleges misappropriation based on Cariquitan's familiarity with Inari[], it implicates the inevitable disclosure doctrine." Mot. 13. Inari's claims are not based on Cariquitan's "familiarity with Inari," but rather on his and Inquis' improper acquisition and use of Inari's trade secrets. The inevitable disclosure doctrine is inapplicable. *Bayer v. Roche Molecular Sys.*, 72 F.Supp.2d 1111, 1120 (N.D. Cal. 1999) (distinguishing inevitable disclosure from claims alleging "actual use" of trade secrets).

*Bank of Am. Tech. & Operations*, 171 Cal. App. 4th 939, 962 (2009).  This test focuses on "whether there is a material distinction" between the trade secrets claim and additional claims."  *Becton, Dickinson v. Cytek Biosciences*, 2018 WL 2298500, at *5 (N.D. Cal. May 21, 2018).  If there is a "material distinction," preemption does not apply.  *Id.*  CUTSA preemption should not be decided at the pleading stage given the fact-intensive inquiry of the analysis.  *See Amron Int'l Diving Supply v. Hydrolinx Diving*, 2011 WL 5025178, at *10 (S.D. Cal. Oct. 21, 2011) (collecting cases).

To the extent the Court conducts the inquiry now, Inari's tortious interference claim is not based on the same facts as Inari's trade secret claims.  The tortious interference claim alleges that Inquis interfered with Inari's contractual relationship with Cariquitan by hiring Cariquitan to work on competing products while knowing about Cariquitan's employment relationship with Inari.  Compl. ¶¶130-40.  This claim is not in any way dependent on Cariquitan's or Inquis' trade secret misappropriation and would be viable even if no such misappropriation had occurred.  CUTSA preemption therefore does not apply.  *See Arthur J. Gallagher v. Tarantino*, 498 F.Supp.3d 1155, 1175 (N.D. Cal. 2020) ("Competing with [original

employer] on behalf of a competitor while still employed with [original employer]" constitutes misconduct "independent of any trade secret[] [misappropriation]").[3]

### C.    Inari's Patent Claims are Sufficiently Pled.

#### 1.    Inquis' Safe Harbor Defense Fails.

Inquis' Accused Products have obtained FDA clearance.  Compl. ¶¶90-91; Mot. 3.  Despite this, Inquis argues that its accused activities fall under the Patent Act's safe harbor provision for "activities necessary to obtain regulatory approval." Mot. 16-19.  But, as the safe harbor provision "is an affirmative defense, Defendants must plead it in their answer and not raise it by way of Motion to Dismiss." *Immunomedics v. Roger Williams Med. Ctr.,* 2017 WL 58580, at *9 (D.N.J. Jan. 4, 2017).  Accordingly, the Court may only "dismiss a complaint 'under Rule 12(b)(6) where an unanswered affirmative defense appears on its face.'"  *REGENXBIO v. Sarepta Therapeutics*, 2022 WL 609141, at *2 (D. Del. Jan. 4, 2022) (quotation omitted).  As discussed below, Inquis applies the wrong legal standard and "fail[s] to demonstrate that the facts alleged in the complaint establish that the allegedly infringing activity is exempted by the §271(e)(1) safe harbor."  *Id.* at *5.

---

[3] Inquis' cases are inapposite because they all considered claims that were dependent on trade secret misappropriation. *See, e.g.*, *Sylabs v. Rose*, 2023 WL 8813517, at *9 (N.D. Cal. Dec. 19, 2023) (finding preemption where "the alleged wrongdoing underlying [plaintiff's] state-law claims mirror[ed] the alleged wrongdoing underlying its CUTSA claim").

The Patent Act's safe harbor exempts acts of infringement that are performed "solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products." 35 U.S.C. §271(e)(1). Thus, it applies largely to activities undertaken *before* obtaining regulatory approval. *See, e.g.*, *Amgen v. Hospira*, 336 F.Supp.3d 333 (D. Del. 2018), *aff'd,* 944 F.3d 1327 (Fed. Cir. 2019). Whether "uses are 'reasonably related' to a §271(e)(1) 'submission' requires more critical analysis in the post-approval context." *Momenta Pharms. v. Teva Pharms.*, 809 F.3d 610, 621 (Fed. Cir. 2015). For example, after approval, "information that may be routinely reported to the FDA" is not covered by the safe harbor, while non-routine submissions may be covered. *See id.* at 619-20. Additionally, "[w]hether a 'use' falls within the Safe Harbor Exemption is a fact-based issue." *Chang v. Biosuccess Biotech*, 76 F.Supp.3d 1022, 1036 (C.D. Cal. 2014).

Inquis concedes the Accused Products have long been cleared by the FDA and that the Complaint discusses numerous facts related to post-clearance infringement. Mot. 3, 18-19. For example, the Complaint alleges that "Inquis has been making, using, selling, and/or offering for sale the Accused Products since before[4] receiving

---

[4] Inquis makes too much of the word "before" here. Mot. 17-18. Inari's

(Continued...)

FDA clearance for them[,]" and "has also been instructing its customers how to use them in infringing ways." Compl. ¶93. Inari also pleads specific facts related to FDA clearance and Inquis' post-clearance conduct that make its allegations plausible. *See, e.g.*, Compl. ¶¶60, 93 (clearance dates); ¶94 (post-clearance LinkedIn and X pages congratulating customers for using Accused Products); ¶95 (post-clearance marketing). Although Inquis criticizes Inari for "not attempting to differentiate between Inquis' activities that relate to FDA approval[,]" it is Inquis that must demonstrate its defense appears on the Complaint's face. *See REGENXBIO*, 2022 WL 609141, at *2. And by acknowledging the Complaint's post-clearance allegations without connecting them to a regulatory submission (as required by §271(e)(1)), Inquis dooms its safe harbor defense. *See Ventrassist Pty v. Heartware*, 377 F.Supp.2d 1278, 1285 (S.D. Fla. 2005) (denying motion to dismiss where "it is certainly *possible* that, through discovery, Plaintiffs may adduce facts indicating that some of Defendant's conduct falls outside of the Section 271(e)(1) safe harbor").[5]

---

allegation, particularly when read in the light most favorable to Inari, is that Inquis engaged in infringing activities before obtaining clearance, *and that it continues to do so after clearance* by, e.g., performing (and instructing its customers to perform) thrombectomy procedures.

[5] Dismissal is also inappropriate because testing discussed in the Complaint (¶¶97, 163, 187, 207) may be unrelated to an FDA submission. *See Horatio Washington Depot Techs. v. TOLMAR*, 2018 WL 5669168, at *13 (D. Del. Nov. 1, 2018).

Inquis' authority does not compel a different result.  *Juno*, *Clarus*, and *Med. Diagnostic,* Mot. 16-19, involved declaratory judgment claims dismissed for lack of immediacy, not at issue here.  *Eli Lilly*, *Merck, Intermedics*, and *Edwards* (Mot. 16-17, 19) evaluated the defense at trial or summary judgment, bolstering Inari's position that it should not be considered now.  Finally, the only motion to dismiss decision cited by Inquis involving conduct after regulatory approval is inapposite both because it was decided before *Momenta Pharms.* and because the patent at issue was directed to the process of drug approval and reporting, as opposed to being directed to a product or drug that advances through that process, as is the case here.  *Classen Immunotherapies v. Somaxon Pharms.*, 2013 WL 9947386, at *5 (C.D. Cal. Apr. 11, 2013).

## 2.   The Complaint Sufficiently Alleges Patent Infringement.

To survive a motion to dismiss, a patent complaint need only "place the alleged infringer on notice of what activity is being accused of infringement."  *Bot M8 v. Sony Corp. of Am.*, 4 F.4th 1342, 1353 (Fed. Cir. 2021) (cleaned up).  A complaint "is not required to specifically include each element of the claims of the asserted patent," *McZeal v. Sprint Nextel*, 501 F.3d 1354, 1357 (Fed. Cir. 2007), and may even "lack[] 'proofs' or 'claim charts.'"  *DSM IP Assets v. Honeywell Int'l*, 700 F.Supp.3d 189, 195 (D. Del. 2023) (Bryson, J.).

Inquis calls Inari's infringement allegations "conclusory" and says "Inari has not plausibly alleged facts demonstrating infringement." Mot. 20. But a patent plaintiff "need not 'prove its case at the pleading stage.'" *Nalco v. Chem-Mod*, 883 F.3d 1337, 1350 (Fed. Cir. 2018). As discussed below, Inari's Complaint puts Inquis on notice of the products and activities accused of infringement, and thus plausibly alleges patent infringement.

Inari's Complaint includes ***23 pages*** of detailed allegations explaining, patent-by-patent and limitation-by-limitation, how the Accused Products infringe the Asserted Patents. Compl. ¶¶89-105, 142-221. In addition to the allegations in the Complaint, Inari attached ***295 pages*** of claim charts, laying out in further detail how the Accused Products infringe. *Id.* Ex. E-H.

Allegations like Inari's, which "provide a factual basis for [the] charge of infringement by specifically identifying the accused products and setting forth [the] infringement theory as to those products on a limitation-by-limitation basis," are regularly found to state a claim. *DSM*, 700 F.Supp.3d at 194; *see also Disc Disease Sols. v. VGH Sols.*, 888 F.3d 1256, 1260 (Fed. Cir. 2018) (reversing dismissal where "complaint specifically identified the three accused products" and "alleged that the

accused products meet 'each and every element of at least one claim" of the asserted patents).[6]

Inquis mischaracterizes Inari's allegations by arguing the Complaint "only cop[ies] and past[es] from Inquis' high level 510(k) submission without any explanation, and in some instances *no evidence at all* regarding alleged practice of each limitation of the asserted claims." Mot. 20-21. Even a cursory review of the Complaint and attached claim charts demonstrates this is not true. Inquis does not identify ***any*** limitations for which Inari did not provide evidence of infringement. Nor could it. *See* Compl. ¶¶89-105, 142-221, Ex. E-H; *see also McZeal*, 501 F.3d at 1357 (specifically including each claim element is not required).

Because Inari's Complaint "specifically identified the [] accused products" "and alleged that the accused products meet 'each and every element of at least one claim of the [Asserted Patents],'" the Complaint puts Inquis on notice of which of its products and activities are being accused and states a plausible claim for infringement. *Disc Disease*, 888 F.3d at 1260.

---

[6] Inari's infringement allegations provide significantly more detail than those found deficient in Inquis' cases. *See, e.g., Uniloc 2017 v. Zenpayroll*, 2021 WL 271800, at *4-5 (D. Del. Jan. 27, 2021) (dismissed because complaint did "not identify or otherwise plausibly allege that the [accused product] include[d]" a claimed element).

3.    <u>The Complaint Properly Relies on Inquis' Patent Materials.</u>

Inquis asks the Court to ignore Inari's infringement allegations that cite Inquis' patent materials because Inari alleged "on information and belief" that the Accused Products embody those patent materials.  Mot. 20.  But as discussed above, pleading on information and belief is permissible where "the requisite factual information is peculiarly within the defendant's knowledge or control." *McDermott*, 649 F.App'x at 267-68.  Here, "Inari has not been able to obtain a sample or Inquis' instructions for use of either of the Accused Products," and the Accused Products are believed to be "available only by sale directly to physicians or hospital providers."  Compl. ¶96.  Accordingly, the facts demonstrating infringement are peculiarly within Inquis' control, and Inari may plead infringement on information and belief.  *See DSM*, 700 F.Supp.3d at 198 (finding similar infringement allegations on information and belief sufficient to "survive motion to dismiss").

Even if Inari were not permitted to do so, Inari's allegations that the Accused Products embody Inquis' '028 Patent and '815 WIPO Patent Application are plausible on their face.  Inari's claim charts cite patent materials and non-patent materials for all but a handful of claim limitations, and the patent materials are consistent with the other cited infringement evidence.  *See* Compl., Exs. E-H.

Moreover, Inquis' '028 Patent and '815 WIPO Patent Application are directed to devices and methods for "disruption and/or removal of obstructive material in a

blood vessel" and "reperfusion," *i.e.*, transfusion back to the patient, "of collected

blood." *Id.*, Ex. E at 9, 44-45.  Similarly, the Accused Products are used for "the

non-surgical removal of emboli and thrombi," *i.e.*, obstructive material, "from blood

vessels" and "autologous blood transfusion" of collected blood back to the patient.

Compl. ¶¶90-91.  Thus, "it is *plausible* that [Inquis'] product[s] implement[] the

patent[s]." *TexasLDPC v. Broadcom*, 2021 WL 1092578, at *1 (D. Del. Mar. 22,

2021) (denying motion to dismiss where infringement allegations were based on

defendant's patent).

### 4.   Inari Sufficiently Pled Indirect and Willful Infringement.

Inari's Complaint alleges knowledge of the Asserted Patents based on "Inari's

cease and desist letter and/or the filing of [the] Complaint."  E.g., Compl. ¶¶157,

181, 201, 218.  Inquis contends that neither is sufficient.  *See* Mot. 21-22.[7]

Regarding the letter, whether Inquis had sufficient time to form the requisite

knowledge is not appropriate to decide at this stage, particularly since the parties had

been engaged in pre-litigation discovery and discussions via the Forensic Protocol.

---

[7] Inquis further argues Inari's allegations are insufficient "for lack of specificity" but does not identify any necessary specificity that is lacking.  Mot. 22.  Inari's knowledge allegations stemming from the cease-and-desist letter and Complaint— both of which detail how the Accused Products infringe—clearly exceed those found deficient in the case Inquis relies on.  *See Deere & Co. v. AGCO*, 2019 WL 668492, at *6 (D. Del. Feb. 19, 2019) (finding allegations insufficient where alleged source of knowledge failed to state that the accused products infringed).

*See* Section III.C; Ex. A, *Continuous Composites, Inc. v. Markforged, Inc.*, No. CV 21-998-MN, Dkt. 15, February 11, 2022 Hearing Tr.  As in *Continuous Composites*, the pre-suit letter differentiates this from other cases this Court has addressed where notice is based on the Complaint alone.

Regarding the Complaint serving as notice, Inari appreciates that courts have expressed different opinions regarding whether a complaint can confer knowledge for indirect and willful infringement.  Inari also appreciates that this Court has previously answered this question in the negative "in the absence of binding authority to the contrary from the Federal Circuit and Supreme Court." *ZapFraud v. Barracuda Networks*, 528 F.Supp.3d 247, 252 (D. Del. 2021).

Since *ZapFraud*, however, Judge Bryson has weighed in on this issue while sitting by designation in this District.  In *DSM*, Judge Bryson addressed whether "knowledge of a patent gained as of the time of the infringement complaint can serve as knowledge of the patent for" indirect and willful infringement without having to file an amended complaint. *DSM,* 700 F.Supp.3d at 199-202.  After reviewing the available case law—including *ZapFraud*—Judge Bryson concluded "a majority of courts that have addressed th[e] issue[s] have held that a charge of post-filing willfulness" and "post-suit indirect infringement" "can properly be predicated on knowledge of the patent as a result of the filing of … the original." *Id.*  Judge Bryson decided to "follow the majority rule," reasoning "it would serve little purpose to

require [a] plaintiff to go through the formality of filing an amended complaint" or a new suit "in order to be allowed to assert knowledge of the patents during the period following the filing of the original complaint." *Id.* at 200.

Given Judge Bryson's recent guidance, Inari respectfully requests that the Court reconsider the holding of *ZapFraud* and find Inari's knowledge allegations sufficient to plead post-suit indirect and willful infringement. Should the Court decide not to follow Judge Bryson, Inari will be forced to file a second lawsuit alleging indirect and willful infringement of the Asserted Patents based on Inquis' knowledge from this suit. Inari respectfully submits that such procedure "would serve little purpose," *DSM,* 700 F.Supp.3d at 200, and result in extra time and expense for the parties and Court litigating a second case.

## V.    CONCLUSION

For at least the foregoing reasons, Inquis' Motion should be denied in full. If the Court grants any part of the Motion, Inari respectfully requests leave to amend.

- 23 -

OF COUNSEL:

John C. Hueston
Christina Rayburn
HUESTON HENNIGAN LLP
620 Newport Center Drive
Suite 1300
Newport Beach, CA 92660
(949) 229-8640

Karen Younkins
HUESTON HENNIGAN LLP
523 W. 6th Street, Suite 400
Los Angeles, CA 90014
(213) 788-4340

*/s/ Sara M. Metzler*
Kelly E. Farnan (#4395)
Sara M. Metzler (#6509)
Edmond S. Kim (#6835)
Richards, Layton & Finger, PA
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
farnan@rlf.com
metzler@rlf.com
ekim@rlf.com

*Attorneys for Plaintiff Inari Medical, Inc.*

Dated: November 18, 2024